GEORGE F. ROGERS' ADMINISTRATOR ET AL. v. R. S. RAGLAND.

1. HOMESTEAD. The terms "*town or city lot or lots*," as used in the Constitution in the homestead clause, cannot be construed to embrace "farm-lots" purchased from the town or city, and used for farming purposes when lying beyond the limits of the plan of the town and city proper, and this though they may be included in the jurisdictional limits of the town or city.

2. HOMESTEAD. B purchased a "building-lot" in the town of Victoria, on which he erected a residence in which he lived with his family; afterwards he purchased other lots, known as "farm-lots," from the corporation of the town, which were within the corporate limits, but removed from the town proper, and which were used by B for farming purposes. *Held*, that the "farm-lots" constituted no part of the homestead, they not being appurtenant to the town residence for homestead purposes.

3. HOMESTEAD. The widow cannot, after the husband's death, abandon the homestead occupied by him at the time of his death, and select from the corpus of the estate another, as against the rights of creditors. (Ragland *v.* Rogers, 34 Texas, 617, overruled.)

ERROR from Victoria. Tried below before the Hon. T. C. Barden.

The estate of John B. Ragland, deceased, being in course of administration in the County Court of Victoria, George F. Rogers being administrator, in June, 1869, Mrs. R. S. Ragland, the widow of deceased, filed her petition alleging, in substance, that in addition to the residence on lot 4, in block 71, of the town proper of Victoria, certain farm-lots on the town tract, designated as lots O, P, and W, and a small fractional lot lying near them, also constituted a part of the homestead of her

late husband, and prayed that all these lots might be set apart to her as a homestead exempt from creditors ; or if that could not otherwise be done, that she be allowed to take the whole at the appraised value, and pay the excess over two thousand dollars, in a reasonable time.

The County Court, upon hearing, refused to set apart any of the farm-lots as homestead, but did set apart building-lot 4, block 71, as the homestead of the deceased.

From this decision of the County Court, Mrs. Ragland appealed to the District Court, by which court the cause was heard at the September term, 1869 ; and a jury having found that the family residence of Dr. Ragland, at the time of his death, was the said building-lot 4, block 71, the District Court, by decree, assigned that lot (and no other) to the widow and children as the homestead. When this decision was made, no notice of appeal was given on the part of Mrs. Ragland, nor were any bills of exception taken, or statement of facts filed.

On the 29th of September, 1869, this decree of the District Court was certified to the Probate Court. ·

On the 28th of October, 1869, the administrator applied to the Probate Court for an order to sell the farm-lots, O, P, W, and fractional lot lying near—making in all $158\frac{93}{100}$ acres—together with some other lots, for the payment of debts.

October 29, 1869, the Probate Court ordered the sale to be made, to wit, on the first Tuesday of December, 1869.

December 7, 1869, being the first Tuesday, the sale was made, and John M. Brownson became the purchaser, at fifteen dollars and fifty cents per acre.

December, 28, 1869, the sale was confirmed by the Probate Court, and conveyance to the purchaser ordered to be made.

October 24, 1870, Mrs. Ragland filed her petition for writ of error upon the above mentioned decree of the District Court, made at September term, 1869.

April 17, 1871, that decreee was reversed by the Supreme Court, on the ground that the District Court had erred in instructions to the jury. (See 34 Texas, 617.)

After the return of the cause to the District Court, Mrs. Ragland amended her petition, claiming the farm-lots as part of her homestead, and made John M. Brownson, the purchaser, a party defendant.

Brownson answered by a general denial, and plea of improvements in good faith, and set up specially the decree of the Probate and District Court, deciding that the land in controversy was not a homestead, and that while that decree was unreversed, and not appealed from, he purchased the land, in good faith, under the order of sale of the Probate Court, etc. But the court, upon plaintiff's exceptions, struck out all the special matter pleaded, and compelled the defendant Brownson to stand upon the general issue, and plea of improvements in good faith.

The court also, upon plaintiff's exceptions, struck out, from the original answer of defendant Rogers, everything except the general issue, and afterwards struck out from his amended answer the allegation that the lots of land in controversy " never were called, or known, or regarded as town-lots by " said John B. Ragland, nor by the inhabitants of the town " of Victoria, or of the county of Victoria;' but said lots were " always designated, known, and regarded by said John B. " Ragland, and by the other inhabitants of said town " and county, as *farm-lands*, as distinguished from *town-* " *lots*."

The jury found a verdict as follows:

" We, the jury, find for the plaintiff the following lots: lot " 4, block 71, and lots O, P, and W, and the fractional lot " set forth in the petition, all of which do constitute the home- " stead."

Judgment was rendered against the defendants, and a writ of possession was awarded against Brownson; a motion for a new trial being overruled, both defendants bring the cause to this court for alleged error.

*Glass & Callender*, for plaintiffs in error.

If, in the case at bar, the farm-lots which compose a planta-
tion can be held as a part of the urban homestead, because they
are "town-lots," a step is taken far beyond anything decided
in Pryor v. Stone, or Hancock v. Morgan.   In those cases, the
"lots" allowed to be held as part of the homestead were cer-
tainly town-lots, according to the ordinary use of language.
But let this case at bar be decided in favor of the appellee,
upon the assumption that the lands sued for are "town-lots,"
and we shall then have a precedent, according to which the
urban homestead may not merely consist of separated lots, but
some of these lots may lie in the town proper and actual, while
the others may, in fact, compose farms of hundreds of acres
lying in the adjacent country.

If this plantation was not homestead during Dr. Ragland's life-
time, could his widow make it homestead by selection after his
death?   We know that doctrine to this effect is intimated in
the opinion delivered by Chief-Justice Evans, when this case
was before the court in 1871.  (34 Texas, 617.)   But we re-
spectfully submit that the decision of this question was not
necessary to the decision of the case as then presented ; that it
was not argued by counsel, and that what was said upon this
point, in the opinion delivered, may properly be regarded as
*obiter dicta*, and yet open to discussion.

It is easy to see that the homestead provisions, as they now
stand in our Constitution and laws, are liable to be greatly
abused ; and he is not very observant who does not know that
many abuses under them exist throughout the country.   ·

If a man owes fifty thousand dollars, and has fifty thousand
dollars in money, with which he ought to pay his debts, but is
fraudulently disposed to defeat his creditors, it is very easy for
him to invest the whole fifty thousand dollars in homestead
property, and live luxuriously upon the income from it, while
his creditors cannot collect a dime from him.   To accomplish
this, he has only to go into some one of our growing, thriv-
ing cities, and invest five thousand dollars of his money in as
much vacant ground as he can buy with that sum, call it home-

stead, and build himself a residence upon it. The law protects him in lots to the value of five thousand dollars, and the value of improvements is not to be counted. His house may cost him five thousand dollars more, and then he will have forty thousand dollars left. With this money he can erect other buildings upon his homestead lots, storehouses or dwellings, and rent them—say for four or five thousand dollars per year. As the city grows, and rents and property advance, he will be able to build more or better houses, and rent them at higher rates, until, as may easily be believed, he may, in a few years, have property worth a hundred thousand dollars, yielding an income of at least ten thousand dollars a year, whilst his creditors— poor men, perhaps—perhaps men broken up by his failure to pay—cannot reach a dollar of this property or income.

If it be said that in such a case the rents might, by process of garnishment, be made liable for the debts of the owner of the homestead, we reply, that we do not see how a discriminating line can easily be drawn between protecting, on one hand, the homestead property from liability for debts, and on the other, subjecting to those debts the rents that issue out of that very homestead property. But suppose the courts should devise, or approve a plan by which it could be done; then, still, the owner of the homestead could easily defeat both the courts and his creditors, by renting only for cash in advance, and thus have no debts for rent that could be garnisheed.

And now, while these evils, which cannot be denied, are perhaps incurable by any remedy the courts can apply, the *obiter dictum* we are discussing takes a step in advance, whereby the rights of creditors must be made still more insecure, and endless complications induced into the settlement of estates.

Heretofore it has been supposed that men might safely lend money upon the security of adequate real estate, which formed no part of the borrower's homestead; and guardians of minors, and holders of trust funds generally, have been accustomed to invest on such security, and feel safe. But if this new doc-

trine is established, and the homestead which the law secures to the widow is not the homestead which her husband held and enjoyed, but an abstract homestead right, which the widow may cut loose from its old mooring, and float to and anchor upon any other real estate to which the husband held title, then no guardian, or trustee, or other person, can lend money upon real estate security, with any guaranty that he may not thereafter find his lien divested, his security gone, and his money lost, because the widow of the borrower has chosen to locate her homestead right upon the land embraced by his mortgage.

It has been frequently held by the court, that the homestead was in no wise subject to administration for the benefit of creditors, and in 1870 it was enacted by the Legislature, that " the " property reserved from forced sale by the Constitution and " laws of this State, or its value, if there be no such property, " does not form any part of the estate of a deceased person " where a constituent of the family survives." (Probate Act, Section 26.) But how are estates to be settled, if what this exempted property is cannot be ascertained. If it is subject to shift and change at the election of the widow, and no time is fixed within which her election shall be made?

How can anything be done, on any sure foundation, if, as in the case at bar, the widow may wait nearly two years after administration is opened before she intimates any claim to certain lands as homestead; and then when her claim is adjudicated against her, she may lie still, in apparent acquiescence, for more than another year, while in the meantime the land has been sold under orders of the Probate Court for payment of debts, and has passed into the hands of an innocent purchaser; and then, after all this, may come into court and say, " If the land was not originally homestead, I claim the right " to select it as a homestead now?" It is not easy to exaggerate the hardships, injustice, uncertainty and confusion which such a state of the law must introduce.

We take it, therefore, that under the true exposition of the

law, there can be no change or enlargement of the homestead after the debtor's death, as against the creditors of his estate If there be no homestead an allowance in lieu of it is provided for; but if there be a homestead, that is the homestead which is to be set apart to the widow and children. The homestead which the husband held exempt from forced sale while he lived, and when he died, is, in our view of the law, the homestead which is exempt from the claims of his creditors after his death. The exemption attaches to the very property itself, to that property as to which the world has had notice that it was not liable for debt, not to a floating right, which may be located upon property which has been the basis of large credits, and in regard to which no exemption was ever thought of, either by the decedent himself or by those who dealt with him.

We conclude, therefore, that the land in controversy was not a part of Dr. Ragland's homestead during his lifetime, and that his widow could not make it homestead, by selection, after his death. We further conclude, that even if the land was homestead, yet, as the question of homestead was adjudicated against the plaintiff, and she failed to prosecute her writ of error until after the land was sold under order of court, for the payment of debts, and passed into the hands of an innocent purchaser, that sale cannot now be disturbed.

*Phillips, Lackey & Stayton*, for plaintiff in error, Brownson.

Upon the question presented by the appeal from Probate Court, we submit, that if the main charge of the court upon the question of homestead be the law, that it is but too manifest that the verdict of the jury under the evidence cannot be sustained. The rural character of the property in controversy is so fully determined by law (see Act V. of February, 1840, 279, Section 14; Paschal's Digest, Articles 622, 596, 598, 600), and by the evidence in this case, that we do not deem it necessary further to consider that question, and we will only briefly notice the law which we believe applicable thereto. Regarding the

property as rural, although within the limits of the territory over which the corporate authorities have jurisdiction (Taylor v. Boulware, 17 Texas, 79), and in connection therewith considering the further fact (as is fully shown by the evidence), that the actual homestead of Dr. Ragland was within the town (proper) of Victoria, and urban, the following questions result and become important: 1st, Could Dr. Ragland hold as exempt during his lifetime, a homestead partly urban and partly rural? 2d, If he could not so hold, can the plaintiff so hold? 3d. If a homestead in fact exists, can the plaintiffs abandon it, and elect other property, to the prejudice of creditors?

The object of the homestead exemption is to secure to every head of a family, for the benefit of the family, a home suited and adapted to the calling or profession of every citizen so entitled. To that end the Constitution protects two characters of homesteads, and determines their extent by two entirely different standards, each of which is so adjusted as to protect a home equal in extent to the demands created by the different employments and avocations of a rural and urban population.

The Constitution and laws seem not to have ever contemplated a mixed homestead. They have erected no mixed standard for the determination of the extent of such an anomaly. Laws are made to meet the general wants of a people subject thereto, not to secure to every isolated citizen that which in his judgment would most tend to his welfare and comfort. The two classes of homesteads embrace and are intended to meet the wants of the two classes of people into which perhaps every civilized nation in the world is divided. The wants and conveniences of society cause those engaged in mercantile, mechanical, or professional pursuits to seek an urban home, for there they can most successfully pursue their several vocations and contribute to the general wants of society; therefore the law protects to such an urban home, measured as to its extent, by its value; while, upon the other hand, those who desire to engage in agricultural or pastoral pursuits seek the country, where they can have an area of land suited in extent to such

employment, and which they cannot obtain within a city or town; and for them the law protects a home determined not by value but by acres. Thus upon grounds of the highest reason has the law-making power of the government established and protected a home for every family that will avail itself of the same, and that there may be no confusion or uncertainty in regard to the extent of the same, has fixed the several standards by which each shall be measured. Can any power, save legislative, exempt something different, and undertake to erect a mixed standard for the determination of the extent of this something? The homestead right once vesting, and then being rural in its character, would not be affected by its being subsequently incorporated into, and actually being made a part of a town (see Bassett v. Messner, 30 Texas, 604), and the foregoing can have no application to such a case.

The second and third we consider together. The law protects to the plaintiff in this case just what it protected to Dr. Ragland, so far as the homestead is concerned (there being in point of fact a homestead), and protects nothing to them which it did not protect to him. If we are correct in the position that a mixed homestead cannot exist, it follows, that if Dr. Ragland had a homestead, in point of fact, in the town of Victoria, that it is that homestead which vests in the plaintiffs, and not another. The exempt property vested by operation of law, without decree of court, in the plaintiffs immediately upon the death of Dr. Ragland. (Sossaman v. Powell, 21 Texas, 664.) This operation of law, though silent, is as effective, and shows as fully the legal determination of the right as though upon the most solemn adjudication. In such case it can with as little propriety be claimed that the right to select something else than the real homestead exists, where there had been a formal setting apart of the homestead by decree, as in the case where the law silently and effectively vests the right. In the absence of a statute so permitting, can it be claimed that the plaintiffs may elect to take another piece of land as homestead, than that which the law declares to vest *instanter*, even with-

out the decree of any court? Surely not. If so, the mere will of the subject is superior to law, or else the law by thus vesting the homestead as it stood at the time of the death of the head of the family, has at least acted precipitately, and done that which the will of the subject may declare of no effect and useless. As the law has been declared to be the perfection of human reason, we are indisposed to believe that any such right exists in the subject, or that the law does a useless or foolish thing; or determines the right without first consulting the interested parties as to their wishes, only to have the same undone, and that determination set aside at the mere volition of parties. If the law did not thus vest the homestead, we would see no reason to doubt the right of the surviving head of the family to change, *bona fide*, the homestead by abandoning that used by the deceased head of the family and occupying another, as fully as the deceased head of the family might have done; but vesting as it does, the exercise of such right of election would operate as a fraud upon creditors, such right being no part of the contract between the parties. If such right had been recognized by the settled construction of the Constitution and of the status touching the subject, then such construction would become part of every contract by which a creditor acquires his demand, and he could not complain. It is not the right to *a* homestead that so vests (if there be one), but it is the right to *the* homestead that vests. The specific property existing, and being in no way undefined by reason of its being a part of a larger or more valuable tract of land than the law so protects, we submit that the right of election does not exist, but that the plaintiff must hold just such homestead as Dr. Ragland had at the time of his death. Such seems to be the effect in the decision in Blair & Co. *v.* Thorp (33 Texas, 49.) If there be no homestead upon the death of the head of the family, the survivor and the children, if there be any, or either of them, are entitled to have the value of the homestead, to be raised out of other property in place of the same, and in this case, if the value of the real homestead be less than the law

protects, we doubt very much, as a specific homestead exists, whether any addition in money can be made thereto. The law exempts a specific thing—it, however, not to exceed a certain value. If the thing exists, the law does not exempt the value, but the thing becomes the exemption. The value would seem to be immaterial. Be this as it may, in this case the interest of all, if the sale to Brownson is upheld, can be fully protected, for after the payment of debts there will be sufficient in the hands of the administrator to make up the homestead's highest valuation as protected by law. But, upon the contrary, if said sale be not upheld, and the positions assumed by the plaintiffs be sustained, then the exemptions will perhaps cover the entire property, and the creditors will lose their debts. From the fact that this case, when formerly before this court, was here without any statement of facts, we have felt that it would not be considered as discourteous in us to offer for your consideration some matters here presented, which otherwise we would not have felt at liberty to present. All of which is respectfully submitted.

*Stockdale & Proctor*, for defendant in error.

. Defendant in error relies upon the following points and authorities :

*First.* The present judgment appealed from is consistent with the reason, and not inconsistent with the letter of the homestead law.

The exemption of the homestead from forced sale by the Constitution, and the laws passed in pursuance thereof, makes it a property, the title to which resides in the family, and this title cannot be divested by any sale except in the manner provided by the Constitution, and laws made in pursuance thereof. (Wilson *v.* Cochran, 31 Texas, 678.)

In this case the homestead, according to the proof, was all within the jurisdictional limits of the town of Victoria, and consisted of several lots, on one of which the house of the usual

residence of the family, near the public square, was situated ;
the others were lots used for the growth of supplies for the
family, and other things, and were distant from the first, but
were, nevertheless, in the town, and subject to taxation and all
the regulations of the town authorities, just as any other prop-
erty whatever ; they were laid off and mapped, with streets for
reaching them, and were lots in the town of Victoria as much
as those fronting on the public square, the difference being only
in size and in the kind of use to which they were likely to be
put ; they were sometimes called " farm-lots," and it was either
as such, or for supplies of fire-wood, etc., that they were gener-
ally used by the inhabitants.

Apply the principles announced in Pryor v. Stone (19 Texas,
371) ; Hancock v. Morgan (17 Texas, 583) ; and Ragland v.
Rogers (34 Texas, 619), to the facts of this case, and all the lots,
the one near the square and the others more remote became,
by the use of them shown in the evidence, parts of a united
whole, and that whole the homestead of the family.

Judge Hemphill says, in the first of these cases, that " It is
" not declared that the lots shall adjoin or be contiguous to
" each other.   All that, by fair construction of the language, is
" required to entitle the property to exemption is, that the prop-
" erty should be used for the convenience or uses of the head
" or members of the family.   The exemption should not be
" construed as reserving merely a residence where a family may
" eat, drink, and sleep, but also a place where the head or mem-
" bers may pursue such business or avocation as may be neces-
" sary for the support and comfort of the family.   *   *   *   *
" The exemption is not to be thus restricted in its benefits.   It
" allows any number of lots, not to exceed two thousand dol-
" lars, and it cannot be material how many, or how far, or how
" near, or remote from each other, may be the lots occupied for
" the convenience of the family, and for the prosecution of the
" business or employment of its head or members."

In Williams v. Hall (33 Texas, 215), Judge Denison says :
" In the case of Hancock v. Morgan (17 Texas, 583), and in
28

" Pryor *v.* Stone (19 Texas, 371), it is decided that a city home-
" stead may consist of separate lots, although the lots do not
" adjoin each other.   The reasons given in those cases apply
" with equal, if. not greater force in this case, to the rural home-
" stead."

The question of homestead or no homestead is a question of
title, upon the death of the husband; and if the fact be that the
property in question is used in the manner and for the purposes
stated by Judge Hemphill, then the title vests, *eo instanti,*
in the surviving family, without the intervention of any decree
of any court whatever.   Any litigation subsequent to this vesti-
ture in the family concerning it, is, and must be, litigation in
regard to the right—the legal right and title to the prop-
erty.

This court has said : " An administrator has but little con-
" cern with the homestead of the deceased.   In no event can it
" be converted to the use of creditors.   They have no interest
" in such property.   *   *   *   *   The homestead is a unit,
" clearly defined and distinct from every other portion of the
" estate, and from every other article which is exempt from
" execution.   It requires no act of specification to fix its iden-
" tity, and therefore vests with or without administration, and
" whether it be or be not set apart by the Chief-Justice."   (Sos-
saman *v.* Powell, 21 Texas, 664.)

But it is contended that. the claim asserted by the widow and
her children, in this case, is a claim for both an urban and a
rural homestead, and that this is in contravention of the Con-
stitution.

In reply, we say that the Constitution has nowhere declared
against a mixed character of homestead, and that the reason of
the homestead provision in that instrument, and of the decisions
of this court, allows it.

Admitting, for the moment, all the plaintiffs in error claim
as to the character of lots O, P, and W, they still come within
the rule in Pryor *v.* Stone, and Williams *v.* Hall, so far as that
rule is founded in reason; and reason being the life of the law,

at least for construction, unless the letter of the Constitution positively forbids, the rule should be applied to the homestead of mixed character as well as to any other.

The Constitution applies two tests to the homestead, one of value for city or town property, and one of quantity to property not in a town or city. If, then, a homestead is partially in and partially not in a town, it is of mixed character, and is subject to both tests. Being a unit, although partaking of both characters, if, upon applying both tests, it answers to each and both, it is certainly within the reason of the Constitution, and not against the letter of that instrument. Where does the Constitution or law say that a homestead shall be wholly in town, or otherwise wholly out of town? A limitation upon the value in a town, and upon the extent or quantity out of town, can hardly be forced into a prohibition against the existence of a homestead that is partially in town and partially out of town. It only requires that both rules of limitation should be applied, and to us it seems " to follow as the night the day," that if the property used as such stand both tests, by all reason it is a constitutional homestead, and is protected by that instrument.

The homestead claimed, in the case of Taylor v. Boulware, consisted of two parcels of land purchased at different times, the first of sixty odd acres, to which was afterwards added five acres nearer the town of Marshall, but adjoining the first. On the five-acre tract were erected the residence and principal buildings, but on the other tract were the horse-lot, slaughter-pen, corn-crib, brick-yard, part of the negro houses, and a branch of water for every-day use. Both tracts were cultivated as a homestead. The whole of the five-acre tract and three acres of the other were, by an act of the Legislature, two years after the homestead was made, included in the corporate limits of the town. The suit was by a purchaser at sheriff's sale, to recover sixty-six acres of the land outside the limits of the town. This court held that the whole of the land, in 1848, constituted the rural homestead, and that the subsequent extension of the jurisdictional limits of the town in 1850 did not

change its character, or subject any portion of it to a forced sale.

The distinction between that case and the one at bar is that Ragland purchased the "farm-lots," after they were laid off and mapped, and when they were within the limits of the town of Victoria.

The case of Moore v. Whitis (30 Texas, 440), decides that a store-house on another lot, two hundred yards from the residence, in the town of Prairie Lea, both being valued at less than two thousand dollars, constituted together the homestead.

The case of Hoffman v. Neuhaus (30 Texas, 633), decides that the homestead is indivisible as long as there is a head of the family, and is "reserved adversely to both heirs and "creditors."

In the case of Young v. Van Benthuysen (30 Texas), 770), this court says : " The Constitution and laws have so hedged " in the homestead from sale, that courts are required to scru- " tinize very closely, to see that all constitutional and statutory " requirements have been fully complied with, before they will " pronounce a sale of the same to be valid."

The case of Bassett v. Messner (30 Texas, 604), decides that thirty-five acres of land adjoining a town, having been made the homestead of a family, and worth at the time of its dedication to that use three thousand five hundred dollars, and at the time of litigation six thousand dollars, could not be affected in its character by the extension of the limits of the town to include it. It, nevertheless, remained a rural homestead, protected by the Constitution, and the law extending the town, so far as it could be considered as affecting the character of the homestead, was void.

It also decides " that the *lis mota* in this case is the home- " stead. From the peculiar laws of Texas, both constitutional " and statute, the administrator has nothing to do with the " homestead."

It is apparent from two of these cases that the homestead may partake, in fact, of both the nature of an urban and a

rural homestead; and that having been dedicated, when they partook of the nature of a rural homestead, the test of quantity alone will be applied, even after the change.

The language of the Constitution, it seems to us, is so plain as not to require construction. "The homestead of a family "not to exceed two hundred acres of land (not included in a "town or city)"—this is the rural homestead, and no homestead can be a rural homestead that is included in a town or city, under the terms of the Constitution, if there are to be only two distinct classes. If so distinctly divided by the Constitution, then the other class must include every other description, and the language of the Constitution fully warrants this conclusion. "Or *any* town or city lot or lots in value not "to exceed two thousand dollars," is the description, which in the nature of things was intended to, and does by the very terms, include every character of homestead actually in a town or city. "Any lot" cannot be confined and restricted to include only a "building-lot," or a lot within what was arbitrarily called the "town proper," as distinguished from the town generally. It cannot be restricted to a lot one hundred varas square, nor to a lot of one acre. The word "any" is not a word of restriction or limitation. The school dictionary defines it: "every, whoever, whatever." Therefore, every lot—whatever lot situated in a town or city is the subject of dedication to any use of the family, which would constitute it the homestead or a part of the homestead. And the constitutional restriction is on its value and not on its quantity; on its use for the comfort of the family or the members of the family and not upon its name of "farm-lot" or "building-lot."

The lots O, P, and W, in this case, are situated in the town of Victoria, subject to its jurisdiction in every particular, and were so situated when acquired by Dr. Ragland and dedicated to home uses. Lot four in block seventy-one was first acquired, and these afterwards, and all became the *unit* called a homestead, according to the rule of this court, in Campbell *v.* McManus (32 Texas, 442).

REEVES, J.   The material facts of this case as developed on the former trial, are indicated in the opinion of the court, reported in 34 Texas, 617, reversing the judgment of the District Court, and remanding the case for another trial.

After the trial in the District Court, and before Mrs. Ragland sued out the writ of error from the judgment which was reversed, the case being certified to the County Court, the administrator, Rogers, applied for and obtained an order from the County Court directing the sale of the lots described as O, P, and W, and the fractional lot, and other lots not in controversy in this suit.   The administrator reported the sale of these lots, to John M. Brownson, to the County Court.   The sale was confirmed, with an order to make title to Brownson.   After the decision of the Supreme Court, Mrs. Ragland, in her amended petition, filed in September, 1871, claims these lots as part of the homestead, alleging that the administrator, Rogers, had obtained the order of sale pending the writ of error in the Supreme Court, and making Brownson a party.   The defendants pleaded in bar of the plaintiff's suit the judgments of the District and County Courts and the proceedings in both courts, and other matters not necessary to be noticed.   Exceptions were sustained to these defenses, and the cause was submitted to the jury with the following result :

"We, the jury, find for the plaintiff the following lots, lot "four, block 71, and lots, O, P, and W, and the frac- "tional lot set forth in the petition, all of which do constitute "the homestead."   And thereupon the order of the Probate Court directing the sale of lots O, P, and W, and the fractional lot, was vacated and set aside, and the sale made in accordance therewith declared null and void, and the lots decreed to the plaintiff as part of her homestead, awarding the writ of possession, and further ordering that the plaintiff be confirmed in her title to and possession of lot four in block seventy-one as constituting part of her homestead.

The defendants moved for a new trial on the following grounds :

1. The verdict is contrary to the evidence.

2. The verdict is contrary to the law.

3. The jury disregarded the instructions of the court.

4. The verdict is not responsive to the issues presented in the case.

5. The jury were misled by a misunderstanding of the instructions of the court.

6. The judgment entered is not authorized by the verdict.

7. The judgment is not authorized by the law.

The motion being overruled both defendants excepted and gave notice of appeal, and assign separate grounds for error in the judgment and proceedings of the court.

Defendant Brownson assigns errors as follows;

1. The court erred in striking out the special matters pleaded by the defendant.

2. The court erred in sustaining the demurrer of the plaintiff to that part of the defendant's answer which set up the purchase of the property in controversy by the defendant Brownson, in which he pleaded the several orders and decrees of the Probate and District Courts of Victoria county, in bar of plaintiff's action for land purchased by Brownson.

3. The court erred in overruling the motion of defendants for a new trial upon the grounds set out in said motion.

G. F. Rogers, administrator of Ragland, assigns as errors to his prejudice:

1. The court erred in sustaining the exceptions of plaintiff to all of this defendant's original answer, except the general issue.

2. The court erred in sustaining the exceptions of plaintiff to part of this defendant's amended answer.

3. In overruling the motion for a new trial.

Under the ruling of the court, the sale of the land to the defendant Brownson, under the order of the County Court, was not presented for the consideration of the jury. The question submitted to the jury was whether the lots, O, P, and W, and the fractional lot, are town-lots or not, and if so whether they

were used by Dr. Ragland in his lifetime as part of his home-
stead, and exempt from forced sale.

As the answer to these questions is believed to be decisive
of the case, it will not be necessary to examine the ruling of
the court upon the exceptions to the defendant's answers.

*First.* Whether the lots O, P, and W, etc., are town-lots or
not, in the sense of the Constitution protecting " any town or
" city lot or lots," etc., the homestead of a family, from forced
sale ?

The Act of February, 1840, incorporating the town of Vic-
toria, provides " that the bounds or limits of said town, and
" within which the said corporation shall exercise lawful juris-
" diction, shall include and comprehend the four leagues of
" land on which the said town is now situated."

This Act recognizes two classes of lots within the limits of the
corporation, one called " town-lots," and the other " farm-lots,"
and authorizes the corporation to sell said lots, and apply the
proceeds of the sales to the purposes pointed out in the Act.

The Act of the Republic of Texas, of December, 1841, con-
firming the title to the town tract to the corporation of Victo-
ria, refers to the division of the tract into " town and out lots,"
and confirms the previous sales made according to that classi-
fication.   The mayor and board of aldermen of the town, in
their records and proceedings, distinguish between " building-
" lots " on the tract of six hundred and forty acres as set apart
for that purpose, and " out-lots " or " farm-lots " for entry and
sale on the east and west side of the river.

It was proved on the trial, that the town of Victoria was
laid out in 1834, on the east side of the Guadalupe River, at
first embracing only a small area within the four leagues of
land granted by the State of Coahuila and Texas, to Martin de
Leon, for the foundation of the town.   Afterwards, and under
the Republic of Texas, the plan of the town proper was ex-
tended to its present limits, embracing an area of one mile
square.   The streets were laid off running nearly east and
west, and north and south, dividing the ground into blocks of

one hundred baras square, each block having four lots fifty baras square.

Afterwards, at different times, and outside of the town proper, under the orders of the town council, the lands were surveyed for sale, and laid off into tracts of different sizes, but generally into blocks of one hundred and sixty acres, subdivided into lots of forty acres. In these surveys, streets were laid out but were not sold. The maps accompanying the statement of facts show the sub-divisions of the four leagues and divisions of the town into blocks and lots.

In 1847, Dr. Ragland purchased lot No. 4, in block No. 71, on the mile square, or town proper, as called by the witnesses, and soon afterwards built a dwelling-house, and made other improvements upon it, and took possession and continued to reside upon it with his wife and children, and family servants, until his death, in 1867.

The lands in controversy, described as O, P, and W, and the fractional lot, were not surveyed and offered for sale until after the year 1868, and in that year the town council offered for public sale a large amount of land situated within the limits of the town tract, on the east and west side of the river, in quantities to suit purchasers, describing the land as of the best quality, well timbered, and well adapted for sugar and cotton plantations.

Dr. Ragland's purchases were made at different times between 1850 and 1855. The map refers to these lots by the letters O, P and W, giving the quantity of each. The deeds describe them by these letters, and as lots or surveys, or as "farm-lots," amounting in the aggregate to one hundred and fifty-eight acres, and a fraction over, situated on the west side of the river, about one mile and a half from lot 4 in block 71, with farms intervening. That the land in controversy consisted of lots called and recognized by the public authorities and by the community as "farm-lots," or terms expressing the same meaning, as distinguished from "building-"lots," or terms of the like import in the town proper, on the

mile square, is too clearly established by the evidence to admit of serious doubt. The lots called farm-lots were not connected with the plan of the town proper; the streets of the town were not extended over the farm-lots. The boundary of the six hundred and forty acre tract, the site of the town, was only extended sixty baras, so that there might be no fractional lots, except on the bank of the river, reserving seventy-five varas on each bank within the town tract, for the use of the corporation. This was in 1839.

The survey of the lands in question was platted on the map, but the streets, though reserved from sale, were never opened, as proved on the trial. Though within the jurisdictional limits of the town, they were known and called farm-lots, but were not regarded as town-lots in the sense of this expression, when used in referring to building-lots in the town. Persons living on the farm-lots said they were going to town when they meant that they were going to the town laid out and built upon the mile square. These lands, when purchased by Dr. Ragland, were mostly covered with dense timber, and were suitable for sugar and cotton plantations, in common with the lands in the vicinity. The tracts adjoin, and were enclosed and cultivated as a farm, on which was planted and raised most of the crops for which the soil was adapted, the cotton and surplus crops being disposed of in the market by Dr. Ragland, as was usual among farmers.

This land was used on the basis of a planting or farming establishment, and was not an appendage of the town residence, and therefore subject to sale as part of Ragland's estate.

The question we are considering was examined to some extent in the case of Taylor v. Boulware (17 Texas, 79), and the court said: "The term lot or lots used in the Constitution, " must be taken and construed in the popular sense of those " terms, and when so used, never would be considered as em- " bracing land within the jurisdictional limits of the corpora- " tion, not connected with the limits of the city." We are of opinion, that the plan of the town proper does not extend over

the tracts of land in controversy, in such a way as to bring them as lots within the terms town or city lots, as usually understood.

It might well be contended that Dr. Ragland never destinated the lands in question, or any part of them, as his homestead. It is not shown that he did, or that he had such intention at any time. On the contrary, his brother, N. M. Ragland, proved that Dr. Ragland always regarded lot 4, in block 71, in the town proper, as his residence and home; that he ate and slept there when not absent on business, and that the cooking and washing for the family were done there, and though it was shown by other evidence that he spent much of his time at the farm, both eating and sleeping there, the weight of the testimony establishes that his homestead was on lot No. 4 in the town proper, where he died, and where with his family he had resided for many years before his death. He was a physician of large practice, and as one or more of the witnesses said, relied on his practice as his principal means of support, or at least that he did not permit the farm to interfere with his practice; his office was on the lot with the dwelling-house, and his patients were directed to call for him at his home or on the farm. Tested by the rule for ascertaining a homestead, as laid down in Philleo v. Smalley (23 Texas), 498, the claim to the tracts of land as part of the homestead is not sustained by the evidence.

The homestead is the place of residence, and so understood. It can, in no proper sense of the term, be said that Dr. Ragland's residence was upon the farm-lands. Though within the jurisdictional limits of the Corporation of Victoria for certain purposes, they were not appurtenant to the town residence for the uses and purposes of a homestead.

It cannot be doubted that Dr. Ragland's homestead was in the town proper, on lot 4, in block 71, the place of his actual residence, and that of his family, at the time of his death, and as such was exempt from forced sale during his lifetime, with the like exemption in favor of his widow and

children, without change or augmentation for deficiency in value.

We do not concur in the views of the court on the former appeal (34 Texas, 617), in effect that the widow might abandon the homestead on the death of the husband, and select a new homestead from the entire estate.

Where the husband died without having a homestead, provision was made for an allowance in place of it, but if there was a homestead, the exemption was for that homestead, and not for another to be selected out of the estate, and set apart to the widow in lieu of it.

We are of opinion that the lands described as O, P, and W, and the fractional lot, formed no part of the homestead at the death of Dr. Ragland, and that his widow has no right to make it her homestead in whole or in part after his death.

The judgment of the District Court is, therefore, reversed and case remanded.

Reversed and remanded.